## RECORD NO. 12-7905

In The

# United States Court Of Appeals

### For The Fourth Circuit

## DONALD WAYNE WATERS,

*Petitioner – Appellant,*

v.

## HAROLD W. CLARKE, Director of the Virginia Department of Corrections,

*Respondent – Appellee.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

_____

### BRIEF OF APPELLANT

_____

**Gregory Dolin,** *Associate Professor of Law*
UNIVERSITY OF BALTIMORE
  SCHOOL OF LAW

**Anna Petrychka,** *Second Year Law Student*
(GEORGE WASHINGTON UNIVERSITY
  LAW SCHOOL)
**1420 N. Charles Street**
**Baltimore, MD  21201**
**(410) 837-4610**

*Counsel for Appellant*

# TABLE OF CONTENTS

**PAGE:**

TABLE OF AUTHORITIES ...........................................................................iv

I.  STATEMENT OF JURISDICTION ...............................................1

II.  STATEMENT OF THE ISSUES ....................................................1

III.  STATEMENT OF THE CASE ........................................................2

IV.  STATEMENT OF FACTS ...............................................................4

    A.  The Service Call & The Investigation....................................4

        1.  Mr. Waters' Visit to the Home of M.G..........................4

        2.  M.G's Allegation of Sexual Assault ..............................5

        3.  The Police Investigation & Mr. Waters' Arrest.........................6

    B.  The Criminal Trial...................................................................8

        1.  Trial Testimony..............................................................8

        2.  Closing Arguments ......................................................13

    C.  Discovery of Evidence Withheld by the Prosecution ........................14

    D.  The Habeas Petition...............................................................19

        1.  The State Court Proceedings........................................19

        2.  The Federal Habeas Petition ........................................24

V.  SUMMARY OF THE ARGUMENT ............................................26

VI.   ARGUMENT ...................................................................................28

    A.    Standard of Review .........................................................28

    B.    All of the Exhibits were Properly Before the Supreme Court of Virginia..................................................................................29

    C.    The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence that the Child Victim Had Been Previously Exposed to Pornography ..................................................................32

        1.    The Virginia Supreme Court's Conclusion as to the Prosecutor's Knowledge of the Evidence is Unreasonable ......33

        2.    The Virginia Supreme Court's Conclusion that "Petitioner Proffer[ed] No Evidence that the Child Ever Viewed Any Pornography" is Unreasonable ...........................35

        3.    The Evidence of M.G.'s Exposure to Pornographic Programming is Material .........................................................37

        4.    Summary ..................................................................43

    D.    The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence of a "Sting" Operation .........................................44

        1.    The Record Clearly Demonstrates that the Sheriff's Office Engaged in a "Sting" ....................................................46

        2.    Evidence of a Sting is Material and Virginia Supreme Court's Conclusion to the Contrary is Unreasonable ..............49

    E.    The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence Pertaining to a Visit to the Victim's Home by Another Technician ..........................................................................51

    F.    Summary of the *Brady* Claims ...........................................60

G.    The Virginia Supreme Court Improperly Adjudicated Mr. Waters' Claims of Prosecutorial Misconduct During Closing Arguments ............................................................................... 61

1.    Because Prosecution Withheld Evidence the Procedural Default Should be Excused ....................................................... 62

2.    The Prosecutor's Comments were Prejudicial ......................... 64

VII.    CONCLUSION .................................................................................. 68

VIII.    REQUEST FOR ORAL ARGUMENT ........................................... 69

IX.    CERTIFICATE OF COMPLIANCE

X.    CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**PAGE(S):**

**CASES:**

*Armour v. Salisbury*,
492 F.2d 1032 (6th Cir. 1974) ...................................................................67

*Auto-Owners Ins. Co. v. Waters*,
No. 3:09-CV-00134-HEH
(E.D. Va., filed March 09, 2009).....................................................15, 16, 18

*Barker v. Fleming*,
423 F.3d 1085 (9th Cir. 2005).........................................................51, 59, 61

*Brady v. Maryland*,
373 U.S. 83 (1963)................................................................................*passim*

*Breard v. Pruett*,
134 F.3d 615 (4th Cir. 1998) .....................................................................62

*Clark v. Edison*,
881 F. Supp. 2d 192 (D. Mass. 2012)....................................................37, 42

*Coleman v. Thompson*,
501 U.S. 722 (1991)....................................................................................62

*Commonwealth v. Junta*,
815 N.E.2d 254 (Mass. App. Ct. 2004) ..................................................44, 45

*Cone v. Bell*,
556 U.S. 449 (2009).....................................................................................64

*Cullen v. Pinholster*,
131 S. Ct. 1388 (2011).............................................................................28, 30

*Doe v. Dish Network Svc.*,
Case No. CL09-12, Goochland County
(Va. Cir. Ct., filed Jan. 29, 2009) ................................................................14

iv

*Doe v. Dish Network Svc.*,
    No. 3:09-CV-93-HEH (E.D. Va., filed Feb. 28, 2009) .................................14

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974).........................................................................64

*Douglas v. Workman*,
    560 F.3d 1156 (10th Cir. 2009) ...........................................................66, 67

*Frazer v. South Carolina*,
    430 F.3d 696 (4th Cir. 2005) .........................................................51, 60, 61

*Giglio v. United States*,
    405 U.S. 150 (1972) ............................................................................32, 66

*Guzman v. Sec'y, Dep't of Corr.*,
    663 F.3d 1336 (11th Cir. 2011) ....................................................29, 60, 61

*Harrington v. Richter*,
    131 S. Ct. 770 (2011)...........................................................................31

*Harris v. Reed*,
    489 U.S. 255 (1989).............................................................................31

*Harvey v. Horan*,
    285 F.3d 298 (4th Cir. 2002) ..............................................................58

*Jones v. Walker*,
    540 F.3d 1277 (11th Cir. 2008) ..........................................................43

*Kyles v. Whitley*,
    514 U.S. 419 (1995)......................................................................*passim*

*Longworth v. Ozmint*,
    377 F.3d 437 (4th Cir. 2004) ..............................................................28

*McCambridge v. Hall*,
    303 F.3d 24 (1st Cir. 2002).............................................................53, 61

*Milke v. Ryan*,
    711 F.3d 998 (9th Cir. 2013) .............................................29, 37, 49, 60

*Miller-El v. Cockrell*,
        537 U.S. 322 (2003)..............................................................*passim*

*Murray v. Carrier*,
        477 U.S. 478 (1986).....................................................................63

*Panetti v. Quarterman*,
        551 U.S. 930 (2007).....................................................................43

*Roach v. Angelone*,
        176 F.3d 210 (4th Cir. 1999) .......................................................63

*Salts v. Epps*,
        676 F.3d 468 (5th Cir. 2012) .......................................................53

*Simmons v. Beard*,
        590 F.3d 223 (3d Cir. 2009) ...............................................*passim*

*Slayton v. Parrigan*,
        205 S.E.2d 680 (Va. 1974) .....................................................62, 64

*Strong v. Johnson*,
        495 F.3d 134 (4th Cir. 2007) .....................................30, 34, 48, 60

*Taylor v. Maddox*,
        366 F.3d 992 (9th Cir. 2004) .......................................................29

*United States v. Alzate*,
        47 F.3d 1103 (11th Cir. 1995) .....................................................44

*United States v. Avellino*,
        136 F.3d 249 (2d Cir. 1998) ...................................................38, 43

*United States v. Bagley*,
        473 U.S. 667 (1985)...........................................................33, 42, 44

*United States v. Cooper*,
        827 F.2d 991 (4th Cir. 1987) .......................................................65

*United States v. Ellis*,
        121 F.3d 908 (4th Cir. 1997) .........................................32, 49, 54

*United States v. Espinal-Almeida*,
    699 F.3d 588 (1st Cir. 2012) ..........................................................................57

*United States v. Higgs*,
    353 F.3d 281 (4th Cir. 2003) ..........................................................64, 65, 66

*United States v. Hoffman*,
    415 F.2d 14 (7th Cir. 1969) ...........................................................................65

*United States v. McLean*,
    715 F.3d 129 (4th Cir. 2013) ..........................................................................32

*United States v. Mitchell*,
    1 F.3d 235 (4th Cir. 1993) ..............................................................................64

*United States v. Peyro*,
    786 F.2d 826 (8th Cir. 1986) ..........................................................................65

*United States v. Powell*,
    680 F.3d 350 (4th Cir. 2012 ...........................................................................65

*United States v. Risha*,
    445 F.3d 298 (3d Cir. 2006) ...........................................................................62

*United States v. Runyon*,
    707 F.3d 475 (4th Cir. 2013) ..........................................................................64

*United States v. Triumph Capital Group, Inc.*,
    544 F.3d 149 (2d Cir. 2008) ...........................................................................44

*United States v. Udechukwu*,
    11 F.3d 1101 (1st Cir. 1993)...........................................................44, 67, 68

*United States v. Weatherless*,
    734 F.2d 179 (4th Cir. 1984) ..........................................................................65

*United States v. White*,
    241 F.3d 1015 (8th Cir. 2001) ........................................................................65

*Vinson v. True*,
    436 F.3d 412 (4th Cir. 2005) ....................................................................62, 63

vii

*Williams v. Ozmint*,
    494 F.3d 478 (4th Cir. 2007) ........................................................28

*Williams v. Taylor*,
    529 U.S. 362 (2000)...........................................................29, 31, 35

**STATUTES:**

28 U.S.C. § 2244(d) ..........................................................................24

28 U.S.C. § 2253(c)(1)(A) ...................................................................1

28 U.S.C. § 2254 ................................................................................1

28 U.S.C. § 2254(d) ...................................................................*passim*

28 U.S.C. § 2254(d)(1).........................................................28, 43, 49

28 U.S.C. § 2254(d)(2).............................................................37, 43

Va. Code § 18.2-67.2 ..............................................................8, 14, 39

Va. Code § 18.2-67.3 ..............................................................8, 14, 39

**RULES:**

4th Loc. R. 25(c) ...............................................................................4

Fed. R. App. P. 4(a)(1)(A) ..................................................................1

Fed. R. App. P. 25(a)(5)......................................................................4

Va. S. Ct. R. 5:20 .............................................................................23

Va. S. Ct. R. 5:20(b)..........................................................................31

**OTHER:**

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").............*passim*

http://free-dish-network-tv.com/adult-programming.html
    (last visited June 18, 2013) ..........................................................16

http://www.goochlandsheriff.org/adminstaff.html
(last visited Oct. 2, 2013)..............................................................................18

Jodi A. Quas, *et al.*,
*Do You Really Remember It Happening or*
*Do You Only Remember Being Asked About It Happening?*
*Children's Source Monitoring in Forensic Contexts*,
*in* CHILDREN'S SOURCE MONITORING, 197 .............................................55, 57

Kim P. Roberts & Mark Blades,
DISCRIMINATING BETWEEN MEMORIES OF TELEVISION AND REAL LIFE,
*in* CHILDREN'S SOURCE MONITORING 147
(Kim P. Roberts & Mark Blades, eds. 2000)...........................................40, 41

Lisa Katayama,
*Sex with the Cable Guy: Does It Really Happen?*,
BBG, April 17, 2009, *available at*
http://gadgets.boingboing.net/2009/04/17/cable-guy-porn.html
(last visited June 22, 2013) ..........................................................................41

Sonja P. Brubacher and Kim P. Roberts,
*Effects of Practicing Episodic Versus Scripted Recall on Children's*
*Subsequent Narratives of a Repeated Event*,
17 PSYCH. PUB. POL. & L. 286 (2011) ........................................................55

THE BIG LEBOWSKI
(Ethan Coen Production 1998) ...................................................................41

"The Erotic Network"
http://en.wikipedia.org/wiki/The_Erotic_Network
(last visited June 18, 2013) ......................................................15, 16, 21, 35

## I.    STATEMENT OF JURISDICTION

This petition for the *writ of habeas corpus* was instituted in the United States District Court for the Eastern District of Virginia pursuant to the provisions of 28 U.S.C. § 2254.    The petitioner, Donald Wayne Waters, was convicted of aggravated sexual battery of a child less than thirteen years of age, and sentenced to a term of twenty years in prison following a jury trial in the Circuit Court for the County of Goochland on June 24, 2005.  J.A. 192-95.  His federal *habeas* petition presented thirteen timely, properly exhausted claims for relief alleging ineffective assistance of counsel and prosecutorial misconduct.  The District Court granted the Respondent's motion to dismiss the petition on September 28, 2012.  J.A. 340-85. The petitioner filed a timely notice of appeal on October 31, 2012.  J.A. 386.  *See* Fed. R. App. P. 4(a)(1)(A).  This Court granted certificate of appealability with respect to three separate issues arising from the allegations of prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963) and on a single issue of prosecutorial misconduct stemming from improper closing arguments. D.E. 20, 38. Accordingly, this Court has jurisdiction under 28 U.S.C. § 2253(c)(1)(A).

## II.    STATEMENT OF THE ISSUES

1.    Did the State Court improperly adjudicate each of Waters' claims of prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963), in determining:

a.    Whether the prosecution improperly withheld evidence that the child victim had been previously exposed to pornography;

b.    Whether the prosecution improperly withheld evidence that it had cooperated in a "sting" operation to arrest Waters; and

c.    Whether the prosecution improperly withheld evidence pertaining to a visit to the victim's home made by a television repair technician other than Waters?

2.    Did the State Court improperly adjudicate Waters' claims of prosecutorial misconduct stemming from the improper statements made by the prosecuting attorney during closing arguments?

## III.    STATEMENT OF THE CASE

Donald Wayne Waters ("Mr. Waters" or "Petitioner"), an inmate in the custody of the Virginia Department of Corrections, appeals the final judgment of the United States District Court, Eastern District of Virginia, which denied his petition for a *writ of habeas corpus*.  J.A. 340-85.  Respondent-Appellee, Harold Clarke, sued in his official capacity, is the Director of the Virginia Department of Corrections (collectively "Respondent" or "the Commonwealth").

On June 24, 2005, the Petitioner was convicted of aggravated sexual battery of a child less than thirteen years of age following a jury trial in the Circuit Court of Goochland County, Virginia.  J.A. 192-95.  On June 11, 2010, Mr. Waters filed

a state *habeas* petition directly with the Supreme Court of Virginia, challenging his conviction and sentence on thirteen substantive grounds. J.A. 389-454. The petition was denied on April 4, 2011, J.A. 130-39, and the motion for rehearing was denied on September 21, 2011. J.A. 75.

On November 28, 2011, the Petitioner filed the federal petition for *habeas* relief in the United States District Court for the Eastern District of Virginia. J.A. 7-18. The federal petition raised the same thirteen grounds for relief, and relied on the same evidence as did the state petition. J.A. 19-154; 389-715. On July 3, 2012, a Magistrate Judge issued a Report and Recommendation, which recommended the District Court grant-in-part and deny-in-part the Respondent's motion to dismiss. J.A. 244-80. The Petitioner and the Respondent each filed objections to the recommendation with the District Court. J.A. 281-339. On September 28, 2012, District Court granted the Respondent's motion to dismiss *in toto*, and denied and dismissed all of Waters' *habeas* claims. J.A. 340-85. The District Court also denied a Certificate of Appealability. J.A. 382-85.

The Petitioner then sought the Certificate of Appealability from this Court. J.A. 386. On May 7, 2013, the Court granted Waters a certificate of appealability as to three issues, each dealing with a claim of prosecutorial misconduct under *Brady*. D.E. 20. On August 23, 2013, the Court granted the Petitioner's motion to

expand the COA so as to include the claim of prosecutorial misconduct during the closing arguments.  D.E. 38.

## IV.   STATEMENT OF FACTS

### A.   *The Service Call & The Investigation*

Prior to his arrest, Donald Wayne Waters was a service and repair technician for Dish Network, which is a provider of satellite television services.  Mr. Waters was a subcontractor of Rocking "R," Inc., which in turn was a subcontractor for Dish Network.  His employment responsibilities included providing repair services to Dish Network customers.  J.A. 518-19.

### 1.   Mr. Waters' Visit to the Home of M.G.

On January 16, 2005, Mr. Waters performed a service call in the home belonging to the parents of M.G.,[1] a four year old female.  J.A. 563-64, 593-94. The house was located in Goochland County, Virginia.  J.A. 593.  The call lasted several hours due to the need to service multiple receivers. J.A. 593, 599.  During the entire time of the call, M.G.'s mother, Nathalie, was present in the house, as were M.G.'s grandparents and a newborn brother.  J.A. 594.  Towards the end of Mr. Waters' visit, M.G.'s father arrived as well.  J.A. 601.  Throughout the service call, Mr. Waters had to access various rooms in the house, including the attic, the

---

[1] In order to comply with Fed. R. App. P. 25(a)(5) and Local Rule 25(c) this brief identifies the minor only by her initials.  For the same reason, the minor's mother is identified only by her first name.

crawlspace, the roof, the master bedroom, and other quarters.  J.A. 636, 638-39.

During the call, M.G. spent most of the time in the master bedroom, and was never

out of the eyesight of her mother for more than 10-15 minutes at a time.  J.A. 597-

98, 634-44.  Whenever Mr. Waters needed to enter the master bedroom, he

specifically asked Nathalie's permission to do so.  J.A. 633.

While working in the house, Mr. Waters had an opportunity to engage in

personal conversations with Nathalie.  J.A. 640-42.  For example, Mr. Waters

commented to Nathalie that her older child, M.G., whom Mr. Waters had a chance

to observe, and with whom he had the opportunity to interact, while Nathalie and

M.G. were showing him the layout of the house and its wiring, J.A. 575, 630-31,

was a friendly and outgoing child.  J.A. 640.  After several hours of work on the

site, Mr. Waters concluded the service call, calmly provided information to

Nathalie, including his cell phone number, and left the house.  J.A. 602, 637.

Nathalie was impressed by Mr. Waters' performance and thought that he was an

"exemplary employee."  J.A. 641.  When he arrived at his own place of residence,

he was calm, collected, and exhibited no unusual behavior. *See* J.A. 196-97.

## 2.   M.G's Allegation of Sexual Assault

Approximately two weeks after the service call, M.G. told her mother that

the "TV man" had "touched [her] vagina," "put his finger right in [her] vagina,"

and "showed [her] his penis."  J.A. 604-06.  The next morning after hearing M.G.

make these allegations, Nathalie contacted her OB/GYN physician who in turn advised Nathalie to take M.G. to the St. Mary's Hospital in Richmond, Virginia. J.A. 607-08. M.G. was brought to St. Mary's the following day (*i.e.*, two days after the initial allegation was made), J.A. 653, and was seen by Shirley Shaheen, RN. J.A. 653, 682. During the examination, M.G. was in no apparent distress, did not experience any pain, and had no noticeable injuries. J.A. 682, 685-86. Neither M.G. nor her mother reported any complaints of pain prior to the examination. J.A. 685. Additionally, in speaking with Nurse Shaheen, M.G. stated, contrary to the statement she later made in court, that "TV man's" finger did not go inside her vagina. *Compare* J.A. 687 (testimony of Nurse Shaheen) *with* J.A. 579 (testimony of M.G.).

### 3.    The Police Investigation & Mr. Waters' Arrest

Prior to taking M.G. to the hospital, Nathalie also contacted the Goochland County Sheriff's Office to report M.G.'s allegation of sexual assault. J.A. 608-09. Terry Pleasants, a lieutenant with the Sheriff's Office responded to the call. *Id.* The next day, Lt. Pleasants came to St. Mary's hospital where M.G. was being seen. J.A. 653. Lt. Pleasants together with Nurse Shaheen, and another forensic nurse interviewed M.G. *Id.*

Following the interview with M.G., Lt. Pleasants contacted Dish Network to find out who was the technician performing the service call. J.A. 654. Lt.

6

Pleasants was directed to Dish Network's subcontractor, Rocking "R", and after contacting Rocking "R"[2] received Mr. Waters' contact information. J.A. 654-55. Rocking "R" also contacted Mr. Waters to advise him that he was being sought by the police. J.A. 655. As soon as Mr. Waters received the information that the police was looking for him, he contacted Lt. Pleasants. *Id.* During the initial phone call, Mr. Waters inquired why he was being sought, but Lt. Pleasants did not reveal any information beyond asking whether he had recently performed a service call on a home in Goochland County. J.A. 655-56. Mr. Waters said that he did not know the answer to that question off hand, but would check his records and call back. J.A. 656. He promptly followed through on his promise and called back Lt. Pleasants. *Id.* He confirmed that he did indeed perform work in M.G.'s house on January 16, 2005. *Id.* He again inquired why he was being sought, and again Lt. Pleasants declined to state the true reasons. *Id.* During the conversation with Lt. Pleasants, Mr. Waters indicated that he was "on his way" to South Carolina and would remain there for two weeks. J.A. 654. He advised Lt. Pleasants to contact him by phone should the need arise, and left her his cell phone number. *Id.*; J.A. 662-64. These conversations occurred on Friday, February 4, 2005. J.A. 654 (stating that the phone calls happened the day after the interview with M.G.); J.A.

---

[2] Lt. Pleasants testified that she contacted Dish Network's subcontractor company, J.A. 654, but did not identify it by name as Rocking "R". The name of the subcontractor appears on Mr. Waters' employment agreement. J.A. 518-19.

679 (noting the date of the interview with M.G.).  The next day, on Saturday, February 5, 2005, Mr. Waters was arrested in Petersburg, Virginia while visiting his employer's warehouse.  J.A. 657.

## B.    *The Criminal Trial*

Mr. Waters was arrested on February 5, 2005 and indicted on February 8, 2005 for "penetrat[ing] with animate object, witness being less than thirteen (13) years of age," in violation of § 18.2-67.2 of the 1950 Code of Virginia as amended. J.A. 33-34.  An additional indictment, stemming from the same set of allegations, was handed down on April 12, 2005 charging Mr. Waters with "sexually abus[ing] a child who is less than thirteen (13) years of age, in violation of § 18.2-67.3 of the 1950 Code of Virginia as amended." J.A. 190.  Prior to trial, the presiding judge, the prosecutor, and Mr. Waters' trial attorney conducted a *voir dire* of M.G. to ensure that she was competent to testify.  J.A. 19-20.  Following the *voir dire* the presiding judge ruled that M.G. was capable of testifying and the matter proceeded to a one-day jury trial on June 24, 2005.  J.A. 20.

## 1.    <u>Trial Testimony</u>

At trial, the prosecution called five witnesses: M.G., Nathalie, Lt. Pleasants, Nurse Shaheen and Miss Melanie Buffenstein – M.G.'s preschool teacher. J.A. 550.  The defense called one witness, Mr. Waters' fiancée, Miss Janine Greene. *Id*.

8

On direct examination, M.G. stated that she was testifying "about the TV man because he touched [her]." J.A. 564. When asked whether she could see the "TV man" she said "No." *Id*. She further testified that on the night in question she was in the master bedroom watching TV and wearing "[a] nightgown and underwear." *Id*. She could not recollect what she was watching. *Id*. Although she could not recollect whether the "TV man" said anything, she testified that he "touched [her] vagina," and showed her "[h]is penis," while having his pants down "[t]o his knees." J.A. 565. Finally, she testified (in response to a leading question) that her baby brother E.G. was "[d]ownstairs in his crib." J.A. 566. At the same time, M.G. said that she did not know where her mother was. *Id*.

Mr. Waters' attorney cross-examined M.G. During cross-examination, M.G. continued to be unable to recall any of the events of the night of January 16th. J.A. 571-76. She testified that she did not know whether the "TV man" had a "beard or a mustache," J.A. 580, that she did not know whether she talked to him, J.A. 379, that she did not remember his tools, J.A. 573-75, or any other interaction with the "TV man." J.A. 580, 572-74. She further testified that she could not remember "TV man's penis" or her description of it to Nurse Shaheen. J.A. 576. Indeed, she testified that she could not recall most of her interview with Nurse Shaheen. J.A. 578-79.

9

To the extent that M.G. could remember anything from the night in question, it was later contradicted by Nathalie's or Nurse Shaheen's testimony. For example, M.G. testified that she showed the "TV man" all of the TVs in the house by herself, J.A. 571, whereas Nathalie testified that it was she (along with M.G.) who showed Mr. Waters around the house. J.A. 630. M.G. testified that the "TV man" was in the house "not too long," J.A. 571, whereas Nathalie testified that the service call took at least an hour and a half, and possibly longer. J.A. 599. M.G. further testified that "[o]nly one" person has "come to work on [the] TV," J.A. 567, whereas Nathalie testified that at least two other TV repairmen visited her house in the preceding eighteen months. J.A. 629. M.G. testified that she was wearing a nightgown and underwear, J.A. 564, while her mother stated that she "does not" wear underwear to bed. J.A. 599. Finally, and most importantly, M.G. testified that she told Nurse Shaheen that the "TV man" put his finger inside her vagina, J.A. 579, whereas Nurse Shaheen testified that during the initial interview M.G. said that the finger was outside the vagina. J.A. 687.

Given M.G.'s lack of recollection, the defense's case centered on the possibility that M.G. is making up her story as a way of seeking attention following the birth of her baby brother and the loss of exclusive parental focus. *See* J.A. 567-60, 576-77, 585-86, 613-28, 658-59, 665-66, 719-20, 725-26.

The Commonwealth next called M.G.'s mother Nathalie to the stand. J.A. 591. Nathalie testified that when Mr. Waters arrived in her home, she showed him around the house so that he would know where the TVs and wires were located, while M.G. followed the two of them. J.A. 630. Nathalie further testified that because Mr. Waters was going to be working in the attic above M.G.'s bedroom, she put M.G. to bed in the master bedroom. J.A. 597-98. Contrary to M.G.'s own testimony, Nathalie stated that M.G. was wearing only a nightgown and no underwear when she went to bed. J.A. 598-99. On cross-examination, Nathalie admitted that she never left M.G. alone for more than ten to fifteen minutes at a time and that when Mr. Waters needed to enter the master bedroom, he specifically and explicitly asked Nathalie's permission to do so. J.A. 633-34. Finally, and importantly, Nathalie testified that she does not let her daughter watch anything on the TV except children's programming. J.A. 598.

Lt. Pleasants was the third witness called by the Commonwealth to testify. J.A. 652. Lt. Pleasants testified that after she began the investigation, Mr. Waters, after being told by his employer that she was looking for him, contacted her voluntarily. J.A. 655, 659. She stated that when she inquired of Mr. Waters whether he performed any work in Goochland County, he checked his records and called her back in short order to confirm that he did in fact perform a service call in M.G.'s home. J.A. 656. Lt. Pleasants further testified that Mr. Waters told her that

11

he would be out of the state for a short period of time, because he was "on his way" to South Carolina and would remain there for two weeks, but he offered her his cell phone number so that she could contact him with further questions. J.A. 655, 663. Finally, Lt. Pleasants testified that contrary to Mr. Waters' statement that he was "on his way" to South Carolina, he was arrested the very next day in Petersburg, Virginia. J.A. 657.

Mr. Waters' trial counsel attempted to explore this apparent conflict during the trial and questioned Lt. Pleasants as follows:

> Counsel: And he told you that he was also planning on going to South Carolina (unintelligible) meeting there, right?
>
> Pleasants: He said he was on his way to South Carolina.
>
> Counsel: Alright, well, on the way to South Carolina, right?
>
> Pleasants: Correct.
>
> Counsel: And he doesn't say I'm going out the door right now, right? He just says that's where I'm planning on being, right?
>
> Pleasants: He says, I'm on my way.

J.A. 663.

Nurse Shaheen, appearing as the next witness for the Commonwealth testified about M.G.'s demeanor and the absence of any physical findings during the medical exam. J.A. 682-88. On cross-examination, she confirmed that during the initial interview, M.G. said that "TV man's" finger did not go inside her (*i.e.*, M.G.'s) vagina. J.A. 687. Nurse Shaheen also testified that when M.G. described

the size of "TV man's" penis, M.G. "extended her arm at full extension." J.A. 685.[3]

The defense called only a single witness, Miss Janine Greene who was a fiancée of Mr. Waters, and a mother of his child. J.A. 196-97. Miss Greene testified that when Mr. Waters returned home from work, he and his clothing were exceedingly dirty. J.A. 196A-197. This stood in contrast with Nathalie's testimony that she observed no dirt marks anywhere on M.G. or M.G.'s clothing or bedding. J.A. 638.

## 2.    Closing Arguments

Following the presentation of evidence, the prosecution and the defense presented closing arguments. Of note, Ms. Oglesby referred to the apparent inconsistency between Mr. Waters' statement to Lt. Pleasants that he was "on his way to South Carolina," and the fact that the very next day he was arrested in Petersburg, Virginia. J.A. 736. Ms. Oglesby argued:

> The defendant says, I'm on my way to South Carolina, be there for two weeks. And he says well, I gave her a cell phone number. I can say is it he was feeling the heat, he didn't want the police to pursue him at that point. For whatever reason, he said South Carolina but he *lied about it* because we know he was arrested on Saturday in Petersburg. So he's a *liar.* And there could be many reasons why he said it, a lot of people do things under pressure, but the facts are undisputed. That he said he was going to South

---

[3] Prosecution's final witness, Miss Buffenstein, testified that M.G. has a general reputation for honesty in her school. J.A. 689-708.

Carolina for two weeks and he was arrested the next day in Petersburg.

*Id.* (emphasis added; original orthography preserved).

The jury returned a split verdict, convicting Mr. Waters on the charge of "sexually abus[ing] a child who is less than thirteen (13) years of age," Va. Code § 18.2-67.3, J.A. 192, but acquitting on the charge of "penetrat[ing] with animate object, witness being less than thirteen (13) years of age," Va. Code § 18.2-67.2. J.A. 135. The jury also recommended that Mr. Waters be sentenced to a term of imprisonment of twenty years and a fine of $25,000. J.A. 193. The Circuit Court imposed the jury recommended sentence on March 10, 2006. J.A. 194-95. The conviction became final when the Supreme Court of Virginia refused Mr. Waters' appeal on March 24, 2009.[4] J.A. 66.

### C. *Discovery of Evidence Withheld by the Prosecution*

While Mr. Waters' appeals were pending, M.G.'s family filed a civil suit against Mr. Waters, Dish Network, Echostar Satellite, and Rocking "R," a Dish Network subcontractor and Mr. Waters' employer.[5] *See Doe v. Dish Network Svc.*, Case No. CL09-12, Goochland County (Va. Cir. Ct., filed Jan. 29, 2009); *Doe v. Dish Network Svc.*, No. 3:09-CV-93-HEH (E.D. Va., filed Feb. 28, 2009). A related case was commenced in the U.S. District Court for the Eastern District of

---

[4] Mr. Waters' petition for rehearing was refused on June 12, 2009. J.A. 67.
[5] The nature of employment relationship between Mr. Waters and Rocking "R" was one of the issues in dispute in the civil case.

Virginia over the existence of insurance coverage for civil claims made by M.G. against Rocking "R." *See Auto-Owners Ins. Co. v. Waters*, No. 3:09-CV-00134-HEH (E.D. Va., filed March 09, 2009). During the pendency of these cases, several previously unknown facts came to light.

*First*, on October 14, 2009, Mr. Waters received a letter from T. Jeffrey Salb, an attorney representing defendants in M.G.'s civil action. J.A. 112-13. The letter stated "[a]t some point during [the settlement] discussions, a comment was apparently made that at least some of the more 'intimate'* subject matter in our Confidential Memorandum were or were believed to have been, discussed with the prosecutor prior to your trial." J.A. 113 (the asterisk is in the original and represented a footnote). The footnote following the word "intimate" read: "Whether the child had ever been exposed to adult programming on the family TV; whether she had ordered a Pay Per View adult movie by mistake; or whether she simply had access to adult programming on their TV system." *Id.* Mr. Waters followed up on this information with Dish Network. According to their records, M.G.'s parents had subscribed to channel TEN from at least June 2004 through at least August 2005. J.A. 490-517. TEN is an acronym for "The Erotic Network." *See* http://en.wikipedia.org/wiki/The_Erotic_Network (last visited June 18, 2013). Channel TEN is described as "the alternative adult entertainment network. TEN provides you with the best value by giving you the most variety in stars, movies

15

and studios." http://free-dish-network-tv.com/adult-programming.html (last visited June 18, 2013).  It is available either as a monthly subscription for $22.99 or as a Pay Per View at the cost of $9.99 for a 90 minute block of time.  *Id.*  The billing records for M.G.'s parents indicate that between June 2004 and August 2005, they subscribed to the TEN channel on a monthly basis.  J.A. 490-517.

Additionally, Dish Network customer service records show that on October 1, 2004 Nathalie contacted Dish Network to complain that "her daughter whom is 4 years order adult PPV ….. by mistake."  J.A. 452 (original orthography preserved).  The customer service representative advised Nathalie that the charge for the movie was not appearing on her account but if it did appear, the bill would be accordingly adjusted.  J.A. 452-53.

*Second*, during a deposition taken in the *Auto-Owners* case, Mr. Gregory S. Ruddell, Sr., the CEO of Rocking "R," testified that he worked with Lt. Pleasants to set up a "sting" to get Mr. Waters arrested.  J.A. 115.[6]  During that deposition, Mr. Ruddell testified as follows:

> A: And I told my VP to set up a sting on the guy to bring him in. Turned out he in Maryland.  So my VP and them arranged a guy that was a manager there … set up a deal in cooperation with the

---

[6] The excerpts of Mr. Ruddell's deposition were submitted to the state court out of order.  In order to allow this Court to easily follow the nature and content of submissions below, these excerpts appear in the Joint Appendix in a manner consistent with the original submission.  Thus, pages 19 of the original deposition can be found at J.A. 115, pages 20-22 at J.A. 446-48, pages 23-24 at J.A. 116-17, and page 33 at J.A. 449.

police to entice him to come into Virginia to pick up some equipment for a job and we did a sting and he got busted.

And so I felt like I – and I also got praise from the police for helping them and all that.

*Id.*

\*\*\*

A: I can't remember the exact details. But in essence once I found out about it, we did what we could to get the guy captured.

\*\*\*

Q: Do you recall having any communications yourself personally with any representatives of the Goochland County Sheriff's Office?

A: Yes.  A lieutenant I believe it was.

Q: Tell me about those discussions.

A: That we set the guy up to get him in. … As far as I was concerned, I did my duty.

Q: What were you told by the lieutenant with the Goochland County Sheriff's Office about what had happened?

A: That there was some incident that happened.  I can't remember exactly what he said to be honest with you. … And my reaction to that was that we'd do our best to cooperate with the police and get him brought to justice.

J.A. 446.

\*\*\*

Q: When Lieutenant Pleasants contacted you and advised you of this event, did you open up a file or make any notes or develop an incident report or do anything of that nature?

17

A: No.  My responsibility as I saw it was to try to help him[7] arrange capturing the subcontractor and let him deal with it.

J.A. 116.

Mr. Ruddell related the same version of events in his answers to the interrogatories in the *Auto-Owners* case.  J.A. 126-27.  In response to Interrogatories #4-5 which asked Mr. Ruddell to identify any communications he had with any other person regarding Mr. Waters, as well as the substance of such communications, he wrote that around February 3rd through 5th of 2005 he had a "[s]eries of phone calls" with Lt. Pleasants "to set up a sting operation in order to get Mr. Waters into custody."  *Id*.

Mr. Ruddell's testimony was corroborated by Frank J. Bayless, a staff attorney for Rocking "R"'s insurance company, the Auto-Owners Insurance Group.[8]  J.A. 118-24.  In testifying about the nature of employment relationship between Rocking "R" and Mr. Waters, Mr. Bayless stated: "He [Mr. Ruddell] understood the severity, he understood what had happened, actually participated with local authorities."  J.A. 120.  At no point was the fact of the cooperation

---

[7] Mr. Ruddell consistently referred to Lt. Pleasants as a "he" even though Lt. Pleasants is female.  *See* http://www.goochlandsheriff.org/adminstaff.html (last visited Oct. 2, 2013).

[8] Mr. Bayless' position and title appears in the Auto-Owners Insurance Group's Rule 26 disclosure.  *See Auto-Owners Ins. Co. v. Waters*, No. 3:09-CV-00134-HEH (E.D. Va., filed March 09, 2009), D.E. 36 at 3.

between Goochland County Sheriff's Office and Rocking "R" management disclosed to Mr. Waters.

*Third*, Mr. Waters discovered that as late as two weeks prior to trial, Nathalie was attempting to contact the Dish Network to verify the identity of the repairman who performed previous service call. J.A. 451. In the email which bore the subject line "Waters Case – Great News," Nathalie advises Ms. Oglesby that the previous repairman visited the house on May 13, 2004 (eight months prior to Mr. Waters) and was an "African American." *Id*. Despite the fact that Nathalie was the only witness to link Mr. Waters to the "TV man" described by her daughter, this email was not disclosed to Mr. Waters prior to trial.

Based in part on these new disclosures Mr. Waters filed a *habeas* petition directly with the Supreme Court of Virginia. J.A. 389-453.

D.    *The Habeas Petition*

1.    The State Court Proceedings

Following the discovery of the previously withheld evidence, on June 11, 2010[9] Mr. Waters filed a *habeas* petition directly with the Supreme Court of Virginia pleading thirteen substantive grounds for relief. J.A. 389-453. Claims 1-6 of the petition alleged ineffective assistance of counsel, Claims 7-9 alleged violation of the disclosure requirement under *Brady v. Maryland*, 373 U.S. 83

_____

[9] The petition was docketed on June 15, 2010.

19

(1963), and Claims 10-13 alleged prosecutorial misconduct stemming from improper statements made by Ms. Oglesby during her arguments to the jury.[10]  J.A. 395-96.  Attached to the original petition were three exhibits: 1) an excerpt from the Rudell deposition, J.A. 445-49; 2) the email exchange between Nathalie and Ms. Oglesby, J.A. 450-51; and 3) a printout of the Dish Network account memos memorializing the conversation between Nathalie and Dish Network's customer service regarding M.G.'s accidental ordering of adult Pay Per View.  J.A. 452-54.

The Commonwealth filed a motion to dismiss Mr. Waters' petition on July 29, 2010.  J.A. 76-106.  Attached to the motion was an affidavit by Ms. Oglesby, J.A. 107-09, in which she claimed that she "was never informed, nor [is] aware, of the victim ever viewing pornographic programming."  J.A. 107.  She also stated that she "was unaware of the [account memo sheet] until [she] was recently provided it along with Waters' [*sic*] petition."  *Id.*  On the issue of email exchange between Nathalie and herself, Ms. Oglesby testified that Nathalie

> was positive in her identification of Waters.  The email the defendant refers to was to clarify that the <u>victim's</u> description of the TV guy could not have been attributed to a previous technician, because the victim described the perpetrator as being white and the previous technician was black.  However, the ability of Nathalie [], the mother, to identify the defendant as the TV technician that came to their house was never in [*sic*] issue.  Also, the victim described the TV Guy as having been there while her baby brother was there.  The defendant

---

[10]  Claims 1-6 (ineffective assistance of counsel), 10, 11, and 13 (propriety of certain statements made during the closing argument) were denied by the Supreme Court of Virginia and the District Court and are not subject of the present appeal.

was the only TV technician that came to their home after the birth of
her brother.

J.A. 108-09 (emphasis in the original; original orthography preserved).

Finally, with respect to the "sting," Ms. Oglesby wrote that her
"understanding was that Waters was already scheduled to be in Petersburg the
morning he was arrested." J.A. 108. No other exhibits, save for trial transcripts
and copies of court decisions were attached to the Commonwealth's motion to
dismiss.

On November 15, 2005, Mr. Waters filed a response to the Commonwealth
motion. J.A. 455-547. However, he did not seek Virginia's Supreme Court leave
to do so. Attached to the response, were additional exhibits, including: 1) billing
statements from Dish Network indicating subscription to the TEN channel, J.A.
490-517; 2) copy of the letter from Mr. Salb to Mr. Waters informing him that
M.G.'s exposure to adult programming was discussed with prosecutors, J.A. 112-
13; 3) additional excerpts from the Ruddell deposition, J.A. 245-48; 4) excerpts
from the Bayless deposition, J.A. 249-55; and 5) excerpts from the Ruddell
interrogatory responses. J.A. 445-49. Mr. Waters also included a letter by his trial
counsel in which the trial counsel stated that if he had been aware of the fact that
M.G. had been exposed to pornographic materials, the information "would have
been further investigated and in part changed the manner in which" defense's case

was structured.  J.A. 128.  Mr. Waters' trial counsel asserted that this information

would have been incorporated into M.G.'s cross-examination.  *Id.*

The Supreme Court of Virginia denied Mr. Waters' petition on April 4, 2011

*in toto* by an unpublished ten page order.  J.A. 130-39.  On the *Brady* claim

stemming from failure to disclose M.G.'s exposure to pornographic materials, the

Court held that the

> Petitioner fails to demonstrate that the prosecutor ever had this
> information and the record, including the affidavit of the prosecutor,
> demonstrates that prosecutor had no information that the victim had
> ever viewed pornographic programming and that the prosecutor first
> saw the exhibit upon which petitioner relies [the account memo
> showing the conversation between Nathalie and Dish Network] when
> she received the petition for a writ of habeas corpus. In addition, the
> exhibit does not clearly identify the victim's family as the customer at
> issue, and a review of the customer record demonstrates that no other
> adult programming had ever been accessed and that this purchase was
> removed. Petitioner proffers no evidence that the child ever viewed
> any pornography.

J.A. 135-36.

On the *Brady* claim that the prosecution failed to turn over the email

communication between Nathalie and Ms. Oglesby the State Court held that

> The documents upon which petitioner relies are not exculpatory.
> The email confirms that petitioner's identity was no mistake
> because the other television repairman had been of a different race
> and because the victim stated her baby brother was sleeping when
> petitioner molested her. The baby had not yet been born when the
> other repairman had visited the house. Furthermore, the victim's
> mother was unequivocal in her identification of petitioner as the
> repairman in question and petitioner had admitted to police that he

had been the repairman who made the service call on the day in question.

J.A. 137 (internal citations omitted).

The Virginia Supreme Court also denied the last *Brady* claim that dealt with the "sting" used to capture Mr. Waters in Virginia. The Court held that the

> [P]etitioner has failed to establish the prosecutor withheld evidence or that the evidence in question was material. The record, including the prosecutor's affidavit, demonstrates that neither the prosecutor nor the Sheriff's Office engaged in any "sting" operation to lure petitioner back into Virginia. Furthermore, even if the Commonwealth had engaged in a "sting" operation to lure petitioner into Virginia, the evidence would only have impacted the collateral matter concerning whether petitioner had lied when he stated he was going to South Carolina. The evidence was not material because it would not have undermined the victim's testimony that petitioner had molested her, and there is no probability that the outcome would have been different.

J.A. 136 (internal citations omitted).

Finally, the Court declined to entertain the claim challenging the prosecution's closing argument characterization of Mr. Waters as a liar, holding that because Mr. Waters' trial counsel did not object to the closing argument the claim was procedurally defaulted.[11] J.A. 137-38.

On May 6, 2011, Mr. Waters filed a petition for rehearing as expressly permitted by the Rules of the Court. J.A. 140-54. *See* Va. S. Ct. R. 5:20

---

[11] All of the remaining claims were also denied, and are not subject to the present appeal.

23

("When a petition filed pursuant to this Court's original jurisdiction (habeas corpus, mandamus, prohibition, or actual innocence) is decided … [c]ounsel for either party may, within 30 days after the date of this order, file in the office of the clerk of this Court a petition for rehearing.").

In this motion to rehear, Mr. Waters again referenced a number of his exhibits (including those that were first presented to the Court in Mr. Waters' brief in opposition to the motion to dismiss) and "renewed" his earlier arguments. *See, e.g.*, J.A. 143, 147. The Court summarily denied the petition in a one sentence order on September 21, 2011. J.A. 75.

2.    <u>The Federal Habeas Petition</u>

Having failed to obtain relief from the state *habeas* court, Mr. Waters filed a timely *habeas* petition with the U.S. District Court for the Eastern District of Virginia on November 28, 2011. *See* 28 U.S.C. § 2244(d) (setting a 1 year statute of limitation for the filing of federal *habeas* petition). J.A. 7-15. In his federal petition, Mr. Waters reasserted all of the grounds for relief that he pleaded in his state petition and relied on the same exhibits. J.A. 16-75, 112-129, 389-547. The Respondent responded with a motion to dismiss. J.A. 155-89. The case was referred to the Magistrate Judge for a Recommendation and Report. J.A. 244.

The Magistrate Judge issued his recommendation on July 3, 2012. J.A. 244-80. In a thorough and well-reasoned opinion, the Magistrate Judge recommended that the Respondent's motion to dismiss be granted-in-part and denied-in-part. *Id.*

Specifically, the Magistrate Judge recommended that on all three of the *Brady* claims, Mr. Waters be allowed to proceed to "discovery, and possibly an evidentiary hearing." J.A. 276. The same recommendation was made with respect to Mr. Waters' claim of prosecutorial misconduct during closing arguments. J.A. 279.

The Magistrate Judge's recommendation was based on a thorough review of evidence before the Court. The Magistrate Judge found that the Supreme Court of Virginia's conclusions are unreasonable because they were either wholly devoid of record support or took an entirely one-sided view of the record by ignoring any and all evidence submitted by Mr. Waters and crediting all evidence submitted by the Commonwealth. J.A. 270-76. Additionally, the Magistrate Judge concluded that the Supreme Court of Virginia unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), when it failed to impute the Deputy Sherriff's knowledge of certain facts to the prosecution, and when it failed to evaluate Mr. Waters' claims in their totality, rather than on the item-by-item basis. J.A. 272-74.

Both Mr. Waters and the Respondent filed objections to the Magistrate Judge's recommendations with the District Judge.  J.A. 281-339.  The District Court issued its opinion on September 28, 2012 and overruled the Magistrate Judge's recommendations to the extent that they denied the Respondent's motion to dismiss.  J.A. 340-85.  Accordingly, the District Court denied and dismissed Mr. Waters' petition *in toto*.  J.A. 382, 385.  The District Court also declined to issue a Certificate of Appealability ("COA").  J.A. 382-85.

Mr. Waters then sought the COA from this Court.  J.A. 386.  The Court issued the COA with respect to the *Brady* claims on May 7, 2013 and appointed the undersigned to represent the Petitioner in this matter.  D.E. 19, 20, 34.  On August 23, 2013, the Court granted the Petitioner's motion to expand COA to cover the issue of prosecutorial misconduct during closing arguments pending the filing of the present brief.  D.E. 38.

## V.    SUMMARY OF THE ARGUMENT

The Supreme Court of Virginia unreasonably adjudicated Mr. Waters' *Brady* claims because its "decision [] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and "involved an unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2254(d).  In making its decision, the State *habeas* court ignored evidence submitted by Mr. Waters, credited a conclusory affidavit by the prosecutor, and

made factual determinations that are entirely devoid of record support. As a result, the State Court's factual findings are unreasonable and are owed no deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

Additionally, in adjudicating each of Mr. Waters' three *Brady* claims, the Virginia Supreme Court, failed to evaluate the cumulative effect of all suppressed evidence to determine whether a violation has occurred. Instead the State Court evaluated each piece of evidence on an item-by-item basis in defiance of the U.S. Supreme Court's mandate. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995). Accordingly, the legal conclusions of the Virginia Supreme Court "involved an unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2254(d).

Additionally, because the Virginia Supreme Court improperly dismissed the *Brady* claims, it erroneously failed to address on the merits Mr. Waters' claim of prosecutorial misconduct stemming from the prosecutor's statements during the closing arguments. These statements were both improper and prejudicial and their overall effect, when viewed in light of the suppressed evidence, warrants a new trial.

In issuing an unreasonable decision based on an unreasonable determination of facts, the Virginia Supreme Court forfeited AEDPA deference. Accordingly, this Court should exercise *de novo* review of Mr. Waters' claims, conclude that the

cumulative effect of violations "undermines confidence in the outcome of the trial," *Kyles*, 514 U.S. at 434, and direct that the *writ of habeas corpus* issue against the Respondent. In the alternative, this Court should direct the District Court to hold an evidentiary hearing in order to allow Mr. Waters to further develop and resolve any conflicts in the record.

## VI.    ARGUMENT

### A.    *Standard of Review*

"When, as in this case, a district court's decision on a petition for a writ of habeas corpus is based on a state court record," the Fourth Circuit reviews the matter *de novo*.  *Williams v. Ozmint*, 494 F.3d 478, 483 (4th Cir. 2007).  The appellate court applies "the same standard that the district court was required to apply." *Longworth v. Ozmint*, 377 F.3d 437, 443 (4th Cir. 2004).  *Habeas* "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), and relief is available only if the state *habeas* court that adjudicated the claim on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

B.  *All of the Exhibits were Properly Before the Supreme Court of Virginia*

Under AEDPA, when a state prisoner's *habeas* claims have been adjudicated on the merits in a State court, a federal court may grant relief only if the State adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).  A State court is unreasonable in applying federal law "if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).   A State court unreasonably applies federal law when it "fail[s] to evaluate the totality of the available [] evidence."  *Id.* at 397.  In other words, "'where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding  unreasonable.'"  *Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013) (opinion by Kozinski, C.J.) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1353 (11th Cir. 2011) (holding that "state courts' decisions were objectively unreasonable because they all but ignored" certain evidence in the record and its import to the defense); *Simmons v. Beard*, 590 F.3d

29

223, 237 (3d Cir. 2009) ("A state court's fact-finding may qualify as unreasonable where 'the state court . . . had before it, and apparently ignored,' evidence supporting the habeas petitioner's claim.") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)).

Following the Supreme Court's decision in *Pinholster*, the federal *habeas* review is limited to the state record. 131 S. Ct. at 1398. Thus, in order to determine whether Virginia Supreme Court was unreasonable in its factual findings, one must first determine the state of the record before the State Court.

At the District Court, the Respondent argued that the State Court record is limited to the three exhibits attached to Mr. Waters' initial petition before the state Supreme Court, and does not include exhibits attached to Mr. Waters' responsive pleadings to the motion to dismiss. J.A. 281-83. It is true that the Virginia Supreme Court was not required to accept Mr. Waters' responsive pleading that was filed without leave of the Court. *See Strong v. Johnson*, 495 F.3d 134, 139 (4th Cir. 2007) (concluding that a responsive pleading was not "evidence presented in the State court proceeding."). It appears from the Virginia Supreme Court's opinion that it did not consider these additional exhibits that were part of the unapproved filing. J.A. 130-39.

However, unlike the petitioner in *Strong*, Mr. Waters also filed a "Motion to Rehear" with the state Supreme Court. This motion is expressly permitted under

the Virginia Supreme Court Rule 5:20(b). The motion for rehearing incorporated and explicitly referred to the exhibits that were part of the responsive pleading. J.A. 140-54. The exhibits in question therefore, formed a part of the State Court's record on which the final decree was issued. Even though the final order from the State Court did not discuss the specifics of Mr. Waters' motion or his evidence, J.A. 75, the U.S. Supreme Court instructs that even if a decision of the state court lacks any explanation, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784-785 (2011); *see also Harris v. Reed*, 489 U.S. 255, 261 (1989) (holding that a federal court may reach the merits of the federal claim "unless the state court's opinion contains a plain statement that [its] decision rests upon adequate and independent state grounds.") (internal citations and quotations omitted).

Thus, the record before the Supreme Court of Virginia included all of the exhibits that Mr. Waters tendered to the federal District Court and which accompany the present appeal. The Respondent's argument to the contrary is simply without any legal or factual basis. Despite having had all of Mr. Waters' exhibits before it, the Virginia Supreme Court, as described in greater detail below, "failed to evaluate the totality of the available [] evidence." *Williams*, 529 U.S. at 397. Its findings are therefore "objectively unreasonable because they all but

ignored" the relevant evidence presented in support of Mr. Waters' petition. *Simmons*, 590 F.3d at 237; *see also Miller-El*, 537 U.S. at 346.

C.    *The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence that the Child Victim Had Been Previously Exposed to Pornography*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  Evidence that can cast doubt on the credibility of a witness is within the scope of the *Brady* rule.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *United States v. Ellis*, 121 F.3d 908, 914 (4th Cir. 1997).  Evidence is "material" if there is "a reasonable probability that disclosure of the evidence would have produced a different outcome."  *United States v. McLean*, 715 F.3d 129, 142 (4th Cir. 2013).  Furthermore, courts making "materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred."  *Ellis*, 121 F.3d at 916; *see also Kyles*, 514 U.S. at 421.  Finally, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal;" *Kyles*, 514 U.S. at 434, rather, "[a] 'reasonable probability' of a different result is [] shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Id.*

(quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  In other words, the petitioner carries his burden "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

The Supreme Court of Virginia rejected Mr. Waters' claim that the prosecution failed to turn over evidence that M.G. has been exposed to pornographic materials.  J.A. 135-36.  Two separate reasons underlied the Court's holding.  First, the Court concluded that Mr. Waters "fail[ed] to demonstrate that the prosecutor ever had this information, and the record, including the affidavit of the prosecutor, demonstrates that prosecutor had no [such] information."  J.A. 135.  Second, the Court concluded that "the [customer account memo] exhibit does not clearly identify the victim's family as the customer at issue, and a review of the customer record demonstrates that no other adult programming had ever been accessed …. Petitioner proffers no evidence that the child ever viewed any pornography."  J.A. 135-36.  Notably, the Court did not hold that the evidence, if true, was not material.  *Id.*  Indeed, there can be little dispute that this evidence, as further explained below, is highly material to Mr. Waters' case.

1.    The Virginia Supreme Court's Conclusion as to the Prosecutor's Knowledge of the Evidence is Unreasonable

The Virginia Supreme Court's decision on this claim is grounded in its factual findings about the state of the record.  However, in making its factual

determination, the State Court simply accepted the prosecutor's affidavit that she was not aware of this information. J.A. 107, 135. The record, however, contained a letter to Mr. Waters from a disinterested third party (counsel for his co-defendants in the civil suit) that explicitly stated that "some of the more 'intimate'* subject matter in our Confidential Memorandum *were or were believed to have been, discussed with the prosecutor* prior to your trial." J.A. 113 (emphasis added). The "'intimate' subject matter" explicitly concerned "[w]hether the child had ever been exposed to adult programming on the family TV; whether she had ordered a Pay Per View adult movie by mistake; or whether she simply had access to adult programming on their TV system." *Id.* Furthermore, the record contained Waters' own sworn affidavit in which he stated that the prosecutor did, in fact, have requisite knowledge. J.A. 426, 442.

As this Court has noted, state courts may sometimes resolve credibility determinations on the basis of conflicting affidavits "when one affidavit is cryptic or conclusory with respect to a contested issue of fact and the other affidavit sets out a detailed account of events." *Strong v. Johnson*, 495 F.3d 134, 139-40 (4th Cir. 2007). Here, however, it was the Oglesby affidavit that was conclusory and self-serving, whereas the Salb letter was from a disinterested third party and discussed details of the civil suit settlement negotiations. Thus, the State Court's peremptory crediting of the Oglesby affidavit and the conclusion that the

"[p]etitioner fail[ed] to demonstrate that the prosecutor ever had this information and the record," J.A. 135, is not just an unreasonable reading of the record, but is diametrically contrary to the evidence in the record.

Because the State Court "failed to evaluate the totality of the available [] evidence," *Williams*, 529 U.S. at 397, and "'apparently ignored' evidence supporting the habeas petitioner's claim," the State Court's findings were unreasonable and need not be deferred to. *Simmons*, 590 F.3d at 237 (quoting *Miller-El*, 537 U.S. at 346).

2.    The Virginia Supreme Court's Conclusion that "Petitioner Proffer[ed] No Evidence that the Child Ever Viewed Any Pornography" is Unreasonable

The Court's conclusion that the "[p]etitioner proffers no evidence that the child ever viewed any pornography," J.A. 136, is impossible to square with the record before the Court. First, the Salb letter specifically refers to statements by M.G.'s parents about the child's exposure to adult materials and/or ordering Pay Per View. J.A. 113. More importantly, Mr. Waters submitted evidence that for at least 6 months prior to M.G. making her accusation against the "TV man," M.G.'s parents subscribed to adult programming on the TEN channel on a monthly basis, *i.e.*, making the adult programming available without the need to order Pay Per View. J.A. 490-517. Together with the Salb letter the billing statements constitute evidence that M.G. was "exposed to" adult programming.

Indeed, as recognized by the Magistrate Judge, the prosecutor "did not state in her affidavit that the family had not previously ordered adult entertainment, nor does she dispute [the] claim that the victim may have had access, or been exposed to adult video. In fact, her statement is carefully limited to the 'victim' not having 'viewed pornographic programming.'" J.A. 271. Because the State Court again "'apparently ignored' evidence supporting the habeas petitioner's claim," its conclusion that the "[p]etitioner proffers no evidence that the child ever viewed any pornography," is plainly wrong, unreasonable, and not entitled to deference from this Court. *Simmons*, 590 F.3d at 237 (quoting *Miller-El*, 537 U.S. at 346).

To make matters worse, the State Court plainly mischaracterized the one exhibit it did not ignore. The State Court found that the customer account memo which memorializes Nathalie's report to Dish Network that M.G. "order [*sic*] adult PPV ….. [*sic*] by mistake," J.A. 452 (entry for 10/01/04), "does not clearly identify the victim's family as the customer at issue." J.A. 135. That conclusion is plainly incorrect as the very same account memo identifies Nathalie by her first name, J.A. 453 (entry of 07/29/04 and 09/06/04), J.A. 454 (entry of 04/03/04 and 05/25/04), as well as by her last name, *id.* (entry of 05/13/04), and address. *Id.* (entry of 06/18/04). Additionally, the same account memo, on the very same page that discusses M.G.'s ordering of adult Pay Per View, identifies Mr. Waters by his last name and first initial on five separate entries including noting that he was "on the

job" on January 16, 2005 – precisely the day that Mr. Waters serviced M.G.'s parents' home.  J.A. 452 (entries of 01/16/05).  Finally, the same account memo reflects that on February 3, 2005, Lt. Pleasants phoned Dish Network to "investigate abt [*sic*] work order."  *Id.* (entry of 02/03/05).  Despite being faced with this overwhelming evidence that the account memo submitted by Mr. Waters referred to the account maintained by M.G.'s family, the State Court concluded that it "does not clearly identify the victim's family as the customer at issue."  J.A. 135.  That conclusion is plainly unreasonable "in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), because "the state court[] plainly misapprehend[ed] or misstate[d] the record in making their findings, … fatally undermin[ing] the fact-finding process ...."  *Milke*, 711 F.3d at 1008.

3.      The Evidence of M.G.'s Exposure to Pornographic Programming is Material

> It is no exaggeration to say that our justice system, civil and criminal, is based to a very large extent on the reliability of human memory. Virtually all witness testimony derives from human memory, and normally the core function of the jury is to assess the accuracy and credibility of those memories.

*Clark v. Edison*, 881 F. Supp. 2d 192, 197 (D. Mass. 2012).

When evidence is withheld, however, the "core function of the jury" is severely undermined. This is especially true when the withheld evidence's "function is impeachment [of] the witness [who] supplied the only evidence

linking the defendant to the crime." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998).

The prosecution's entire case against Mr. Waters rested on the credibility of M.G. and the accuracy of her memory. M.G. was the sole witness who provided "the only evidence linking the defendant to the crime." *Id*.[12] Thus, M.G.'s credibility and ability to properly recollect facts was of paramount importance at trial. Yet, M.G.'s recollection of events was spotty at best. When asked if she could identify the "TV man" she twice failed to do so. J.A. 564. When asked what the TV man looked like, she answered "I don't know." J.A. 567. When asked whether the "TV man" had a beard or a mustache, she gave the same answer. J.A. 580. Although M.G. stated that the "TV man" exposed himself to her, when queried whether she remembered the "TV man's penis," she said "no." J.A. 576. M.G. also could not remember whether the "TV man" said anything to her.[13] J.A. 565. In total, M.G. responded "I don't know" over fifty times. J.A. 563-91.

Indeed, the jury understood that M.G.'s testimony was not fully reliable. Although at court M.G. testified that the "TV man" put the finger inside her

---

[12] Three of the other witnesses put forth by the Commonwealth merely confirmed that M.G. has told them that the "TV man" touched her. The testimony of the fourth witness, Lt. Pleasants, (which will be discussed in more details in Parts VI.D & VI.G) also concerned the interaction between herself and Mr. Waters. However, even Lt. Pleasants' testimony did not provide any physical or other corroborating evidence of the assault.

[13] There were other, additional discrepancies between M.G.'s testimony and that of her mother and Nurse Shaheen. *See ante* Part IV.B.1.

vagina, J.A. 579, the jury heard evidence that when she was interviewed by Nurse Shaheen, M.G. stated that the finger was outside. J.A. 667, 687. Because of this inconsistency with testimony, the jury acquitted Mr. Waters on the charge of "penetrat[ing] with animate object, witness being less than thirteen (13) years of age." Va. Code § 18.2-67.2. *See* J.A. 134-35 (noting that the jury acquitted because of likely doubts about M.G.'s testimony). Thus, the jury was already somewhat skeptical of the reliability of M.G.'s memory. The withheld evidence would likely have made the jurors question not only the details of M.G.'s allegation, but her recollection of the event as a whole.

Because the key piece of evidence was not made available to Mr. Waters, the jury heard nothing that might undermine M.G.'s testimony that she was in fact molested. That testimony seemed consistent and led the jury to convict on the remaining charge of "sexually abus[ing] a child who is less than thirteen (13) years of age." Va. Code § 18.2-67.3. J.A. 192. Had the jury heard evidence that M.G. had been exposed to pornography, that "evidence could reasonably be taken to put the whole case in [] a [completely] different light." *Kyles*, 514 U.S. at 434. The jury could have concluded that M.G.'s memory of being touched by the "TV man" was false and stems not from actually being molested, but from seeing pornographic images on television.

M.G.'s exposure to pornography is particularly salient because it casts doubt on her recollection of being sexually molested. Scientific studies have shown, time and again, that children of M.G.'s age "can confuse memories of real-life and televised events that they have witnessed." Kim P. Roberts & Mark Blades, DISCRIMINATING BETWEEN MEMORIES OF TELEVISION AND REAL LIFE, in CHILDREN'S SOURCE MONITORING 147, 163 (Kim P. Roberts & Mark Blades, eds. 2000). Indeed, children often "report information acquired through watching television programs as if they had actually seen it happen in a real-life event." *Id.* As Drs. Blades and Roberts have found,

> Confusing memories of television and real life is one way in which children's eyewitness reports may be contaminated. In some situations, it may be helpful for investigators to explore whether any information reported by children could have been gleaned from television programs, and to make an effort to corroborate the details in the child's account. This is also an issue in those situations in which sexual abuse is suspected …; it may be possible that some of this information was learned through television instead of, or in addition to, a real-life experience.

*Id.* at 165. In the present case, neither the police, nor Mr. Waters' attorney "explore[d] whether any information reported by [M.G.] could have been gleaned from television programs." While the police's action is simply inexplicable, Mr. Waters' attorney was prevented from conducting a proper investigation because the Commonwealth failed in its duty to disclose relevant exculpatory information to Mr. Waters.

40

Indeed, Mr. Waters' trial counsel affirmed that the unavailability of the evidence that M.G. was exposed to pornographic material impacted the way the defense was presented. J.A. 128-29.

At trial, Mr. Waters' trial counsel attempted to show that M.G. was confabulating in order to gain sympathy and attention of her parents that she felt she lost with the birth of her baby brother. *See* J.A. 567-60, 576-77, 585-86, 613-28, 658-59, 665-66, 719-20, 725-26. Had the withheld evidence been made available, the defense could have argued that while M.G. is fully convinced that she is telling the truth, in fact her memories are poisoned by the exposure to pornographic material, and are therefore false and unreliable. Such a conclusion would have been consistent with the scientific understanding of childhood memories and M.G.'s inability to describe the "TV man," or recognize him in the courtroom, or recollect anything that he may have said. [14] It would also be quite consistent with the M.G.'s description of the "TV man's" penis being the size of

---

[14] Children's memories are particularly unreliable when there exists a "similarity of characteristics in memories of televised and actual events." Roberts & Blades, *supra* at 166. As it happens, the "cable guy" motif is a mainstay of pornographic movies. *See* Lisa Katayama, *Sex with the Cable Guy: Does It Really Happen?*, BBG, April 17, 2009, *available at* http://gadgets.boingboing.net/2009/04/17/cable-guy-porn.html ("There are pornos with titles like Cable Guy Sex and Blue Collar ****hole …," and citing to "CableGuySex.com" – an entire website dedicated to just such pornographic material) (last visited June 22, 2013). The motif has become such a cliché that it is spoofed in mainstream cinema. *See, e.g.*, THE BIG LEBOWSKI (Ethan Coen Production 1998).

her extended arm, J.A. 685, for that very well could be the size that is projected on a large screen television.

Finally, the evidence of M.G.'s exposure to pornographic materials could have been used to impeach Nathalie's testimony. On direct examination, Nathalie testified that she "do[es] not allow her daughter to watch anything other than kids' programs." J.A. 598. Had Mr. Waters' defense had access to evidence that Nathalie's daughter watched programming other than "kids' programs" and that Nathalie knew about it, his trial counsel could have pointed to that significant inconsistency in the testimony, thus calling Nathalie's veracity into question. This evidence could have also cast doubt on Nathalie's linking of "TV man" referred to by M.G. to specifically Mr. Waters.

In short, evidence that M.G. was exposed to pornographic materials was material to, and undermined the credibility of, the key prosecution witnesses. By failing to disclose this information, the prosecution undermined the "core function of the jury [–] to assess the accuracy and credibility of those memories." *Clark*, 881 F. Supp. at 197. Because the "evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," there the government's evidentiary suppression 'undermine[d] confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

4.     Summary

The Supreme Court of Virginia was unreasonable in its factual findings that Mr. Waters failed to show that the prosecution was in possession of the exculpatory evidence and that he failed to show that the complaining victim was exposed to pornographic materials.   The State Court reached its decision by ignoring a number of exhibits submitted by Mr. Waters and by grossly mischaracterizing other exhibits.   Accordingly, the State Court is owed no deference on that finding. *See Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) ("[W]hen a state court's adjudication of a habeas claim 'result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' *Id.* § 2254(d)(2), this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them.") (alterations and citations in original); *see also Panetti v. Quarterman*, 551 U.S. 930, 952-53 (2007) (holding AEDPA deference inapplicable when state court made unreasonable determination of law under 28 U.S.C. § 2254(d)(1)).

Furthermore, because the withheld evidence went to the heart of the credibility of the "witness [who] supplied the only evidence linking the defendant to the crime," *Avellino*, 136 F.3d at 257, the evidence was highly material to the issue of Mr. Waters' guilt, and its "suppression 'undermines confidence in the

43

outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. 667 at 678).

Accordingly, the *writ of habeas corpus* should issue on this claim. Alternatively, the Court should remand the matter to the District Court for further discovery directed to the question of whether the evidence was in prosecutor's possession.

D.    *The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence of a "Sting" Operation*

In *Brady* itself, the Supreme Court held that the failure to disclose information that corroborated the defendant's version of the events constituted a denial of due process.   373 U.S. at 87.   As the Massachusetts Appeals Court observed, "[d]ue process is violated … if the prosecution fails to produce evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story … or challenges the credibility of a key prosecution witness." *Commonwealth v. Junta*, 815 N.E.2d 254, 259 (Mass. App. Ct. 2004); *see also United States v. Triumph Capital Group, Inc.*,  544 F.3d 149 (2d Cir. 2008) (reversing a conviction when the prosecution suppressed evidence that corroborated defendant's story); *United States v. Alzate*, 47 F.3d 1103 (11th Cir. 1995) (same); *United States v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993) (same).  Furthermore, for the purposes of *Brady* analysis it is irrelevant whether the individual prosecutor personally knew of the evidence in question.  *See Kyles*, 514

U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

In the present case, the evidence of a "sting" both "furnishes corroboration of the defendant's story [and] challenges the credibility of a key prosecution witness." *Junta*, 815 N.E.2d at 259.

At trial, the prosecutors attempted to cast doubt on the veracity of Mr. Waters by insinuating that he was not forthcoming (and outright deceitful) with Lt. Pleasants during her investigation. J.A. 654-56, 736. There was (and is) no dispute that Mr. Waters was nothing but cooperative with the investigator, that he promptly returned her phone call, checked his record as he promised he would, and when asked whether he had performed any service calls in Goochland County, promptly confirmed that he had been to M.G.'s residence. *See* J.A. 655-56, 662-64. Thus, the only way to show Mr. Waters' purported deceitfulness was to show inconsistency between his statement to Lt. Pleasants that he was "on his way to South Carolina" and the fact that in reality he was supposedly in Virginia where he was arrested the very next day. This served to paint a contrast between the seemingly consistent story by M.G. (at least with respect to the allegation that the "TV man" touched her) and the supposedly dishonest answers Mr. Waters gave to Lt. Pleasants. *Compare* J.A. 730-34 (Ms. Oglesby's argument that M.G. was

consistent and truthful) *with* J.A. 736 (Ms. Oglesby's argument that Mr. Waters "lied" about the trip to South Carolina).

The prosecutor elicited testimony from Lt. Pleasants that confirmed that although Mr. Waters said on Friday, February 4, 2005 that he was on his way to South Carolina, he was arrested the very next day in Virginia.  J.A. 655-57.  The prosecutor further highlighted this discrepancy in her closing arguments when she accused Mr. Waters of "lying" to the police.  J.A. 736.  *See also infra*, Part VI.G.

The Virginia Supreme Court rejected this claim for relief for two reasons. First, it held that "[t]he record, including the prosecutor's affidavit, demonstrates that neither the prosecutor nor the Sheriff's Office engaged in any "sting" operation to lure petitioner back into Virginia."  J.A. 136.  Second, it concluded that "the evidence would only have impacted the collateral matter.  The evidence was not material because it would not have undermined the victim's testimony that petitioner had molested her, and there is no probability that the outcome would have been different."  *Id.*  Both of those conclusions are unreasonable in light of the record.

### 1.    The Record Clearly Demonstrates that the Sheriff's Office Engaged in a "Sting"

Mr. Waters' initial pleading with the Virginia Supreme Court included, as Exhibit 1, sworn testimony of Mr. Waters' employer, Mr. Gregory S. Ruddell, Sr. That testimony unequivocally stated that he "set up a sting," J.A. 446, after talking

with a lieutenant from the Sheriff's Office about "set[ting] up the guy to get him in." *Id.* Mr. Ruddell went on to say that his goal was to "cooperate with the police and get [Mr. Waters] brought to justice." *Id.* Even had Mr. Waters not presented additional evidence in support of his claim, the State Court's conclusion "[t]he record, including the prosecutor's affidavit, demonstrates that neither the prosecutor nor the Sheriff's Office engaged in any "sting" operation," is objectively unreasonable in light of Mr. Ruddell's sworn testimony.

But this was not the only evidence Mr. Waters produced. In his petition for rehearing which incorporated his responsive pleading to the Commonwealth's motion to dismiss, Mr. Waters produced three additional supporting documents that bolstered the initial exhibit. First, there was a further excerpt from the Ruddell deposition where Mr. Ruddell testified that the Vice President of his company and the police "arranged a guy that was a manager there [in Petersburg, Virginia] set up a deal in cooperation with the police to entice [Mr. Waters] to come into Virginia to pick up some equipment for a job and we did a sting and got him busted." J.A. 115. Mr. Ruddell further testified that he "got praise from the police for helping them and all that." *Id.* Second, Mr. Waters submitted excerpts from interrogatories which asked Mr. Ruddell to identify any communications he had with any other person regarding Mr. Waters, as well as the substance of such communications. J.A. 126-27. Mr. Ruddell's answer stated that around February

3rd through 5th of 2005 he had a "[s]eries of phone calls" with Lt. Pleasants "to set up a sting operation in order to get Mr. Waters into custody." *Id.* Finally, Mr. Waters submitted an excerpt of a deposition by Frank J. Bayless, a staff attorney for Rocking "R'"s insurance company in which Mr. Bayless testified that Mr. Ruddell "actually participated with local authorities" to capture Mr. Waters. J.A. 120.

The Commonwealth's only response to these exhibits was an affidavit by Ms. Oglesby. J.A. 107-09. However, that affidavit did not even deny that Lt. Pleasants participated in a sting operation. Instead, Ms. Oglesby wrote that it was her "*understanding* was that Waters was already scheduled to be in Petersburg the day he was arrested," and that "the Sheriff's Department did not instruct Rocking "R" to have the defendant come to any location as part of a sting." J.A. 108 (emphasis added). In other words, Ms. Oglesby could not swear that such a sting did not occur and/or that the police did not participate. On the other hand, Messrs. Ruddell and Bayless did in fact swear that the sting did occur with full participation by Lt. Pleasants. Thus, the State Court was once again faced with a "one affidavit [that] is cryptic or conclusory with respect to a contested issue of fact and the other affidavit sets out a detailed account of events," *Strong*, 495 F.3d at 139-40, yet chose to credit the conclusory affidavit. Once again the State Court "all but ignored," *Simmons*, 590 F.3d at 237, the relevant evidence marshaled by

48

Mr. Waters, once again "plainly misapprehend[ed] or misstate[d] the record in making [its] findings, … fatally undermin[ing] the fact-finding process," and therefore, once again "render[ed] the resulting factual finding unreasonable.'" *Milke*, 711 F.3d at 1008.

2.    Evidence of a Sting is Material and Virginia Supreme Court's Conclusion to the Contrary is Unreasonable

It is axiomatic that "materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred." *Ellis*, 121 F.3d at 916; *see also Kyles*, 514 U.S. at 421. It is therefore not particularly relevant whether this particular evidence, *standing alone* would have "undermined the victim's testimony that petitioner had molested her." Instead, the question is whether such evidence *taken together with other undisclosed evidence* would have created a "'reasonable probability' of a different result." 514 U.S. at 434. Virginia Supreme Court's failure to apply the proper legal standard is "contrary to … clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Given that the case turned solely on the credibility of the complaining witness and the jury's evaluation of Mr. Waters' honesty in dealing with the police, the credibility of Lt. Pleasants was critically important. It was especially important in light of the fact that had evidence of M.G.'s exposure to pornographic materials

were made available to the jury, M.G.'s credibility would have been significantly

called into question. As the Magistrate Judge correctly noted

> Waters' counsel also tried to minimize the conflict Lt. Pleasants
> presented between Waters' intended destination and the location of
> his ultimate arrest, but Pleasants was steadfast. Given that all of the
> evidence was presented in a half-day, the amount of time devoted to
> laying the foundation for Waters' "lie" is not insignificant. If Rocking
> "R's" statements are true, and Pleasants knew of, or directed Waters'
> reassignment to Virginia, in order to effect the arrest, his counsel, with
> appropriate disclosure, would have been able to completely prevent
> this testimony, and the resultant suggestion in closing that Waters was
> "a liar" who was "feeling the heat." Had the prosecutor persisted with
> the characterization, Lt. Pleasants would have been severely
> impeached.

J.A. 274.

With the availability of evidence undermining the credibility of M.G. and

Nathalie, *see ante,* Part VI.C, coupled with evidence undermining the credibility of

Lt. Pleasants and/or confirming Mr. Waters' truthfulness during his dealings with

the police, the Commonwealth would have been left with little to build the

conviction on.[15] At the very least, "the government's evidentiary suppression

---

[15] The Respondent may, as he did in the District Court, argue that the Ruddell
deposition is not exculpatory because Mr. Ruddell testified that when his VP and
Lt. Pleasants set up their sting, Mr. Waters was in Maryland. J.A. 629-30. This
argument is without merit. First, Mr. Waters had not had the opportunity to
question Mr. Ruddell about recollection regarding Mr. Waters' location. Second,
given that it is undisputed that Mr. Waters' job took him to various locations in the
region. *See, e.g.* J.A. 243-44, 520B. Thus, being in Maryland while
simultaneously being "on the way" to South Carolina may be entirely consistent
with the defendant's version of events.

undermine[d] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (internal quotations omitted).

"Because the [Virginia] Supreme Court failed to complete the second half of the equation, which requires evaluation of the cumulative effect of all the withheld evidence separately and at the end of the discussion, its decision was contrary to clearly established Federal law as set forth in *Kyles*." *Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (internal citations and quotations omitted); *see also Kyles*, 514 U.S. at 437.  Accordingly, the State Court is not entitled to deference on this issue and this Court must exercise *de novo* review.  *See Frazer v. South Carolina*, 430 F.3d 696, 718 (4th Cir. 2005).  Exercising such review, the Court should conclude that the prosecution withheld the evidence of a "sting," that this evidence was material, and that the *writ of habeas corpus* should issue on that basis.

E.  *The Supreme Court of Virginia was Unreasonable in Concluding that the Prosecution Did Not Improperly Withhold Evidence Pertaining to a Visit to the Victim's Home by Another Technician*

It is undisputed that a mere two weeks prior to Mr. Waters' trial and full four months after Nathalie contacted the police with M.G.'s allegation about the "TV man," Nathalie was still attempting to pin down the identity (and appearance) of previous technician who visited her residence.  J.A. 451.  It is also undisputed that Ms. Oglesby was in possession of this information as she was the recipient of

Nathalie's email which describes Nathalie's continued efforts and information obtained from the Dish Network. *Id.* Finally, it is undisputed that this email was not turned over to Mr. Waters.

When Mr. Waters discovered the suppressed email, he petitioned for *habeas* relief from the Virginia Supreme Court. J.A. 389-454. In response, the Respondent attached an affidavit by Ms. Oglesby to its motion to dismiss. J.A. 107-09. The affidavit stated that Nathalie "was positive in her identification of Waters. The email the defendant refers to was to clarify that the <u>victim's</u> description of the TV guy could not have been attributed to a previous technician, because the victim described the perpetrator as being white and the previous technician was black." J.A. 108 (emphasis in original). The affidavit went on to state that "the victim described the TV Guy as having been there while her baby brother was there. The defendant was the only TV technician that came to their home after the birth of her brother." J.A. 108-09. The State Court adopted Ms. Oglesby reasoning nearly verbatim when it found "[t]he documents upon which petitioner relies are not exculpatory." J.A. 137. In State Court's view, "[t]he email confirms that petitioner's identity was no mistake because the other television repairman had been of a different race and because the victim stated her baby brother was sleeping when petitioner molested her. The baby had not yet been born when the other repairman had visited the house." *Id.* These findings are both

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and "involved an unreasonable application of[] clearly established Federal law."  28 U.S.C. § 2254(d).

As an initial matter, the record is entirely devoid of the victim identifying the "TV man" in any way whatsoever.  To reiterate, when M.G. was asked if she could identify the "TV man," she twice failed to do so, J.A. 564, even though Mr. Waters was sitting barely 20 feet away.  When asked what the TV man looked like, M.G. answered "I don't know."  J.A. 567.  When asked whether the "TV man" had a beard or a mustache, she gave the same answer.  J.A. 580.  At no point did she identify "perpetrator as being white."[16]  That Ms. Oglesby swore, under oath, to a fact that has no support whatever in the trial record casts doubt on the entirety of her affidavit, both on this issue and on other *Brady* issues identified *ante*.  Yet, the Virginia Supreme Court unhesitantly accepted this characterization of the record. J.A. 137.  Because the State Court's conclusion is not based on anything in the record, it is necessarily unreasonable.  *See McCambridge v. Hall*, 303 F.3d 24, 37 (1st Cir. 2002) (*en banc*) ('[T]he state court decision may be unreasonable if it is devoid of record support for its conclusions or is arbitrary."); *Salts v. Epps*, 676 F.3d 468, 475 (5th Cir. 2012) (holding that determination by "state appeals court ...

---

[16] Like the Magistrate Judge, the undersigned thoroughly read the entire trial record and was unable to find any references to the "TV man's" race.  Indeed, it appears that the only time word "white" was mentioned was when M.G. described "TV man's" T-shirt.  J.A. 565.

that the [defendants] had waived their right to conflict-free representation ... was an unreasonable determination of fact" where the record was "devoid of documentation or evidence of th[e] purported waiver."). Because M.G. never identified her assailant as "white" the fact that the other technician was black is irrelevant to the exculpatory nature of the email.

Moreover, the State *habeas* Court again failed to "evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred." *Ellis*, 121 F.3d at 916. The State Court concluded that because M.G. testified that her baby brother E.G. was "[d]ownstairs in his crib," J.A. 566, the possibility that the other repairman was responsible is negated, because the previous visit occurred prior to E.G.'s birth. J.A. 137. The problem with this analysis is two-fold. First, it ignores the suppression of other evidence that would have undermined jury's confidence in M.G.'s recollection – specifically, M.G.'s exposure to pornographic materials. *See ante*, Part VI.C. With this additional evidence, the jury could have concluded that M.G. had melded several separate events into a single, but incorrect "recollection." Such a conclusion would be quite plausible given the jury's skepticism of other aspects of M.G.'s story – skepticism that resulted in Mr. Waters' acquittal on the charge of penetration with an animate object. *See* J.A. 134-35 (noting that the jury acquitted because of likely doubts about M.G.'s testimony).

Next, the email chain indicates that, up until two weeks before trial neither Nathalie nor the prosecution were sure about even the timing of the assault. The first time that M.G. was asked about the presence or absence of her brother E.G. in the house was around June 8, 2005, *i.e.*, *six months after* Mr. Waters' visit to her home and just two weeks prior to trial. J.A. 451. Given the large time lag between Mr. Waters' visit and M.G.'s statement about her brother's whereabouts during the assault, it is quite possible that two separate events were conflated in M.G.'s mind. It is a well-known phenomenon that young children have difficulty monitoring the source of the memory for a particular event, especially if they have experienced similar events. *See, e.g.,* Sonja P. Brubacher and Kim P. Roberts, *Effects of Practicing Episodic Versus Scripted Recall on Children's Subsequent Narratives of a Repeated Event*, 17 PSYCH. PUB. POL. & L. 286, 290 (2011); Jodi A. Quas, *et al.*, *Do You Really Remember It Happening or Do You Only Remember Being Asked About It Happening? Children's Source Monitoring in Forensic Contexts*, *in* CHILDREN'S SOURCE MONITORING, *supra* 197, 199 ("The combination of lengthy delays and repeated interviews may have particularly negative consequence's on children's ability to identify the source of their event memories."); *id.* at 208("Studies generally suggest that children's memory and source-monitoring accuracy deteriorates with time, and the amount of deterioration may be greater for younger than older children."). In other words, it is quite possible that M.G.

experienced several visits by a "T.V. man" and remembered an assault during one of these visits, but is unable to identify when that assault occurred.[17]   This is particularly likely in light of M.G.'s testimony that "[o]nly one" person has "come to work on [the] TV." J.A. 567. Viewed in that light, the fact that the first time M.G. mentioned her brother's presence in the house occurred six months after Mr. Waters' visit, and then only in response to a suggestive question by her mother,[18] is exculpatory.

Making the matters worse still, the question was posed to M.G. after she was interviewed several times by the police and the Commonwealth's Attorney. In other words, it is quite possible that not only did M.G. conflate two separate events, but did so due to having her memories corrupted by the interviews. Psychological studies are replete with evidence that young children are particularly

---

[17] The state court's conclusion that "the victim's mother was unequivocal in her identification of petitioner as the repairman in question and petitioner had admitted to police that he had been the repairman who made the service call on the day in question," J.A. 296, is also irrelevant. Mr. Waters never denied that he visited M.G.'s home to perform a service call. The issue though, is not whether he visited the home for legitimate business purposes, but whether he was the one that molested M.G. and whether the assault occurred "on the day in question." Thus, Nathalie's correct recollection that Mr. Waters visited her house has no bearing on the exculpatory nature of the email.

[18] In her email, Nathalie writes "I asked M[. G.] where was E[. G.] when the TV came and she said he was seepling [*sic*] in his bed." The question itself suggested to M.G. that E.G. was born and somewhere in the house. The most natural answer for a four year old child to give is that her baby brother (who likely spends most of the time in the crib) was in fact in his bed. Given the circumstances and the nature of the question, the accuracy of the question leaves a lot of room for doubt. The defense should have had the opportunity to explore this.

vulnerable to suggestions during interviews, with these suggestions becoming incorporated as a "memory." *See, e.g.*, Jodi A. Quas, *supra* at 199-200 ("The combination of lengthy delays and repeated interviews may have particularly negative consequence's on children's ability to identify the source of their event memories. … Children may trust and believe police officers' suggestions because of their perceived authority status and subsequently report suggested information as having occurred."); *id.* at 210 ("In forensic settings, the authority status of the interviewer (*e.g.*, a police officer) may be especially salient, increasing the likelihood that children will report information suggested by the interviewer, if for no other reason than because the interviewer is thought to be a highly credible source."); *id.* at 216-17 (noting that in studies, the accuracy of children between 3 and 5 years of age as to whether the event occurred in real life or was merely suggested by the interviewer, was not much greater than chance). Thus, the timing of M.G.'s first statement that her brother was indeed "sleeping in his bed," and the fact that it occurred after several interviews with authority figures is material and potentially exculpatory. Failure to reveal such a material and potentially exculpatory fact to the defense constitutes *Brady* violation. *See United States v. Espinal-Almeida*, 699 F.3d 588, 618 (1st Cir. 2012) ("To establish a Brady violation a defendant must provide the court with at least "some indication" that the materials he seeks to access contain material and potentially exculpatory

evidence."); *Harvey v. Horan*, 285 F.3d 298, 316 (4th Cir. 2002) (Luttig, J., opinion respecting the denial of rehearing *en banc*) ("For the better part of a half-century, if not longer, the government has been required, as a matter of procedural due process, or basic fairness, to produce to the defendant all potentially exculpatory evidence in order to ensure that the defendant's trial is fair, a requirement that emerged out of recognition that the interest of our criminal justice system is not only in convicting the guilty but also in ensuring that the innocent are not wrongfully convicted.") (internal citations omitted).

Finally, the email is relevant not only to M.G.'s testimony, but also that of her mother's. Nathalie was the only person that linked the undifferentiated "TV man" in M.G.'s allegation to the specific person of Mr. Waters. It is that linkage that allowed the jury to convict Mr. Waters of sexual abuse. Yet, Nathalie was unsure of the linkage up until two weeks prior to trial and attempted to confirm her own suspicions by placing inquiries about the prior repairman with the Dish Network. J.A. 451. As the Magistrate Judge noted the fact "that the victim believed her brother was downstairs when the assault occurred, was known to the victim's mother long before the email and, thus, would not explain her continued effort to exclude the other technician as a suspect."[19] J.A. 276. The only plausible

---

[19] The Magistrate Judge was actually too solicitous of the Commonwealth's view of the evidence. As the discussion above indicates, "that the victim believed her brother was downstairs when the assault occurred," was *not* "known to the victim's

explanation then for Nathalie's continued inquiries was that she herself was unsure about the identity of the "TV man" (and may have had doubts about M.G.'s timeframe). Defense was however precluded from exploring this lack of confidence and the contrast between it and the certainty expressed by Nathalie during the trial. Similarly, the defense was precluded from asking why Nathalie waited for six months to ask M.G. about where her baby brother was during the time of the assault and exploring how Nathalie's questioning affected M.G.'s in-court and out-of-court responses.

The withheld evidence of the email between Nathalie and Ms. Oglesby was exculpatory because, when viewed in combination with other withheld evidence, it tended to seriously undermine the credibility of the Commonwealth's two main witnesses. The cumulative effect of the evidence was such that it "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434. And because the Virginia Supreme Court failed to evaluate the cumulative effect of all the withheld evidence … its decision was contrary to clearly established Federal law," *Barker*, 423 F.3d at 1094, and is not entitled to

---

mother *long before* the email." Instead, it came to light *contemporaneously* with the call to the Dish Network. J.A. 451. This further indicates that Nathalie was unsure who the suspect could have been, or when he came to the house. It is quite possible that the way Nathalie phrased her question to M.G. and the answer she got was heavily influenced by the result of Nathalie's conversation with Dish Network's customer service.

deference. *Frazer*, 430 F.3d at 718. Exercising *de novo* review, this Court should that this evidence was material and issue the *writ of habeas corpus* on that basis.

F.    *Summary of the Brady Claims*

Mr. Waters is entitled to the *writ of habeas corpus* because "the government's evidentiary suppression 'undermine[d] confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). This Court owes no AEDPA deference to the conclusions of the State Court because these conclusions were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," and "involved an unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2254(d). The State Court "had before it, and apparently ignored, evidence supporting the habeas petitioner's claim," thus making its factual findings objectively unreasonable. *Simmons*, 590 F.3d at 237 (internal citations and quotations omitted); *see also Miller-El*, 537 U.S. at 346; *Milke*, 711 F.3d at 1008; *Guzman*, 663 F.3d at 1353. Instead, the State Court, turning *Strong v. Johnson* on its head relied on an affidavit that was "cryptic [and] conclusory with respect to [] contested issue[s] of fact," while discrediting other evidence that "set[] out a detailed account of events." 495 F.3d at 139-40. In doing so, it erroneously concluded that Mr. Waters failed to show (1) that M.G. was exposed to pornographic movies, (2) that the prosecution had evidence of such exposure, (3)

that the prosecution participated in a "sting" to lure him back to Virginia, and (4) that the email between Nathalie and Ms. Oglesby regarding the identity of a previous repairman was exculpatory. On each of these issues, the State Court either "all but ignored" certain evidence in the record and its import to the defense, *Guzman*, 663 F.3d at 1353, or made findings "devoid of record support," *McCambridge*, 303 F.3d at 37, makings its factual determinations unreasonable.

Additionally, because the Virginia Supreme Court failed to evaluate all of the evidence cumulatively and instead conducted solely an item-by-item analysis, "its decision was contrary to clearly established Federal law as set forth in *Kyles*." *Barker*, 423 F.3d at 1094; *see also Kyles*, 514 U.S. at 437. In short, the unreasonable decision of the Virginia Supreme Court is not entitled to deference. *Frazer*, 430 F.3d at 718. On a *de novo* review, this Court should conclude that the cumulative effect of the withheld evidence is such that it "undermine[d] confidence in the verdict," *Kyles*, 514 U.S. at 434, and issue the writ on that basis. In the alternative, the Court should remand the matter to the District Court for further discovery.

G.    *The Virginia Supreme Court Improperly Adjudicated Mr. Waters' Claims of Prosecutorial Misconduct During Closing Arguments*

During the closing arguments, Ms. Oglesby highlighted Lt. Pleasants' testimony about her interaction with Mr. Waters. J.A. 736. Ms. Oglesby argued that Mr. Waters "lied" about being "on his way" to South Carolina because he was

61

"feeling the heat." *Id.* She explicitly called Mr. Waters a "liar" and claimed that this fact was undisputed. *Id.* Thus, Ms. Oglesby relied on a knowingly[20] false narrative in order to paint an unfavorable (and misleading) picture of Mr. Waters.

The Virginia Supreme Court dismissed this claim on the grounds that Mr. Waters' trial counsel failed to object to the statement, thus defaulting them under the rule of *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974). J.A. 137-38.

### 1.    Because Prosecution Withheld Evidence the Procedural Default Should be Excused

Generally speaking, "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). Mr. Waters concedes that the rule of *Slayton* would, in most instances, provide "an independent and adequate ground for the dismissal" of his claim. *See Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2005). However, a federal *habeas* court may excuse the default if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "To

---

[20] It is irrelevant whether she actually knew of the "sting" operation, because the prosecutor is held to constructively know "evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437; *see also United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).

establish 'cause,' a prisoner must show that some objective factor *external to the defense* impeded counsel's efforts to comply with the State's procedural rule." *Vinson*, 436 F.3d at 417 (emphasis in original; internal quotations omitted). "Cause exists, and will serve to excuse the failure to raise a claim during a state proceeding, where the factual or legal basis for the claim was not reasonably available to the claimant at the time of the state proceeding." *Roach v. Angelone*, 176 F.3d 210, 221-22 (4th Cir. 1999).

In the present case, Mr. Waters' trial counsel failed to object to the characterization of Mr. Waters as a "liar" precisely because the prosecution withheld evidence that the seeming inconsistency in Mr. Waters' story was a result of a police-orchestrated "sting." *See ante*, Part VI.D. This withholding of information was beyond defense's control and therefore was an "objective factor external to the defense [which] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Had that information been available to the defense, Mr. Waters' trial counsel could have made an appropriate objection, and would have been able to present the full story to the jury. Being deprived of this evidence, the counsel wisely made a decision not to object so as to not further draw the jury's attention to the this seeming inconsistency in Mr. Waters' account. However, this trial strategy would have never been pursued had Mr. Waters' counsel not been improperly deprived of vital

information.  In short, the *Brady* violation, *see ante* Part VI.D, affected not only the cross-examination of Lt. Pleasants, but the ability of counsel to object to the improper statements by Ms. Oglesby.  For this reason Mr. Waters' *Slayton* default should be excused.

### 2.    The Prosecutor's Comments were Prejudicial

Because the Supreme Court of Virginia "did not reach the merits of [Mr. Waters'] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA …. Instead, the claim is reviewed *de novo*."  *Cone v. Bell*, 556 U.S. 449, 472 (2009).

It is well established that comments during closing arguments can violate defendant's constitutional rights if "they 'so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.'" *United States v. Runyon*, 707 F.3d 475, 510 (4th Cir. 2013) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In order to make such a showing, the petitioner "must demonstrate (1) that the government's remarks were in fact improper and (2) that the remarks 'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'"  *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)).

It should be beyond dispute that Mr. Waters has satisfied the first part of the *Higgs* test.  It is an unremarkable observation that referring to the accused as a

"liar" during closing arguments is, in and of itself, improper (though not necessarily prejudicial).[21]    *See, e.g.*, *United States v. Cooper*, 827 F.2d 991, 995 (4th Cir. 1987) ("[T]he prosecutor engaged in an improper excess of advocacy when he called defense witnesses 'liars.' The argument was quite improper …."); *United States v. Weatherless*, 734 F.2d 179, 181 (4th Cir. 1984) (noting that "remarks [calling the defendant a liar] were well beneath the standard which a prosecutor should observe."); *see also United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001) ("As a general rule, a prosecutor may not express a personal opinion about a defendant's veracity."); *United States v. Peyro*, 786 F.2d 826, 831 (8th Cir. 1986) ("Statements by the prosecutor such as, 'The man is an obvious liar,' have no place in a criminal trial."); *United States v. Hoffman*, 415 F.2d 14, 21 (7th Cir. 1969) ("[R]eference to defendant as a liar, crook, wheeler and dealer, and similar terms were not conducive to the fair trial to which defendant was entitled."). Thus, Mr. Waters has unquestionably satisfied the first prong of the *Higgs* test.

---

[21] In *United States v. Powell*, 680 F.3d 350, 358 (4th Cir. 2012), this Court declined to hold that referring to the defendant as a liar is "is, per se, improper." However, given the citations that followed the quoted sentence, it is clear that the Court was focused on *prejudice* (*i.e.*, the second prong of the test) rather than *propriety* (the first prong of the test) of the remark.

Furthermore, "the remarks prejudicially affected [Mr. Waters'] substantial rights so as to deprive the [him] of a fair trial." *Higgs*, 353 F.3d at 330 (internal quotations omitted).

The analysis of this prong is inextricably intertwined with the question of whether a *Brady* violation occurred when the prosecution failed to turn over to Mr. Waters' evidence that Lt. Pleasants created a "sting" to lure Mr. Waters to Virginia. *See ante*, Part VI.D. It necessarily follows that if the prosecution failed to turn over appropriate evidence, it only compounded the constitutional error by relying on such withholding of information to paint an unfavorable picture of Mr. Waters.

This case is similar to *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009). In *Douglas*, the Tenth Circuit was confronted with a situation where the prosecutor withheld evidence from the defense about an agreement between the district attorney and a key prosecution witness, with the prosecutor further compounding the error by improperly "vouching" for the witness's credibility during the closing argument. *See id.* at 1190. The Tenth Circuit held that such behavior amounted to prosecutorial misconduct of sufficient magnitude to require that the *writ of habeas corpus* issue. *Id.* at 1196. As that court noted, referring to the rule laid down by the Supreme Court in *Giglio v. United States*, 405 U.S. 150 (1972), "[T]he basic [tenet] of *Giglio* does not depend on whether misleading information was given to

the jury in the form of a closing argument by a prosecutor rather than through the testimony of a witness." *Douglas*, 560 F.3d at 1192 (quoting *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974)) (alterations in original).

In the present case, the prosecutor, instead of vouching for its own witness's credibility, disparaged the credibility of the defendant. But whether with respect to its own witnesses, or those of the defense, or the defendant himself, the prosecution is not permitted to provide misleading information to the jury either through testimony or through argument. *Id.* This is precisely what Ms. Oglesby did here. She knew (either directly or constructively) that the reason Mr. Waters was in Petersburg, Virginia was because he was lured there by a "sting" organized by Mr. Waters' employer and Lt. Pleasants. *See ante*, Part VI.D. Despite this knowledge, Ms. Oglesby provided misleading information to the jury about the reason for Mr. Waters' visit to the warehouse. J.A. 736. Thus, the statement that Mr. Waters is a "liar" was not merely "improper," but "prejudicial," because it was purposely misleading.

The First Circuit reached the same result in *United States v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993). There, the government knew that the information provided by the defendant was corroborated (at least in part) by its own investigation. *Id.* at 1104-05. Nonetheless, during her closing arguments, the prosecutor cast doubt on the defendant's story and implied (without explicitly

saying so) that the defendant was a liar.  *Id.* at 1105.  The First Circuit concluded that "[i]t is all the more improper to imply reliance on a fact that the prosecutor knows to be untrue," *id.* at 1106, and that this impropriety required a vacatur of the conviction even where the "record [] present[ed] a strong case against the defendant – overwhelming with respect to her transporting the drugs and substantial in suggesting knowledge that the objects carried were contraband."  *Id.* In this case, the prosecutor, in her closing arguments, relied on the fact that she knew to be untrue (Mr. Waters' allegedly voluntary presence in Virginia) in a case where the evidence against Mr. Waters was far from "overwhelming." Accordingly, the statement was sufficiently prejudicial to warrant a new trial and thus requiring the issuance of the *writ of habeas corpus*.

## VII.  CONCLUSION

For the foregoing reasons, the Petitioner respectfully requests that the judgment of the United States District Court for the Eastern District of Virginia be reversed, and that the *writ of habeas corpus* issue against the Respondent.  In the alternative, the Petitioner respectfully requests that the matter be remanded to the United States District Court for the Eastern District of Virginia for further discovery and an evidentiary hearing.

## VIII.  REQUEST FOR ORAL ARGUMENT

Petitioner-Appellant respectfully requests that this matter be calendared for oral argument.

Respectfully submitted on this 17th day of October, 2013.

/s/  Gregory Dolin
Gregory Dolin, *Associate Professor of Law*
UNIVERSITY OF BALTIMORE
  SCHOOL OF LAW

Anna Petrychka, *Second Year Law Student*
(GEORGE WASHINGTON UNIVERSITY
  LAW SCHOOL)
1420 N. Charles Street
Baltimore, MD  21201
(410) 837-4610

*Counsel for Appellant*

## IX.   CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation per the Order Granting Motion to Exceed Length Limitations filed on September 3, 2013.

    this brief contains <u>16,901</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.


    /s/ Gregory Dolin
    Gregory Dolin

    *Counsel for Appellant*


Dated:  October 17, 2013

## X.  CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 17, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Aaron J. Campbell
> Matthew P. Dullaghan
> OFFICE OF THE
>   ATTORNEY GENERAL OF VIRGINIA
> 900 East Main Street
> Richmond, VA  23219
> (804) 786-2071
>
> *Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> /s/ Shelly N. Gannon
> Shelly N. Gannon
> GIBSON MOORE APPELLATE SERVICES, LLC
> 421 East Franklin Street, Suite 230
> Richmond, VA  23219